Filed 2/25/22  In re A.F. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,  Plaintiff and Respondent,  v.  B.F.,  Defendant and Appellant. | F083486  (Super. Ct. Nos. 20CEJ300227-1, 20CEJ300227-2, 20CEJ300227-3)  **OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gary L. Green, Commissioner.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Carlie Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Peña, J. and Meehan, J.

B.F. (Mother) and A.C. (Father) are the parents of A.F., now eight years old; A.R.C., now five years old; and B.C., now four years old (collectively children). Pursuant to Welfare and Institutions Code section 366.26, the juvenile court terminated Mother's and Father's parental rights.[1]  Mother timely appealed.[2]

Mother challenges the juvenile court's finding that the beneficial parent-child relationship exception to termination of parental rights did not apply, and she seeks reversal of the court's order under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). Mother contends that in determining whether the exception applied, the juvenile court focused on improper factors, improperly discounted the social worker's testimony that she had a positive relationship with the children and was important to them, and failed to acknowledge *Caden C.*, which precludes us from presuming the court properly balanced the relevant considerations.  She also claims the juvenile court's decision was premature given the length of the children's most recent and fourth placement.

We reject Mother's claim and affirm the juvenile court's order terminating her parental rights.

## FACTUAL AND PROCEDURAL SUMMARY

### Referral

Mother and the children lived with Mother's fiancé, V.C., and his sister; and V.C. supported Mother and the children.  On August 16, 2020, Mother called emergency services and requested an ambulance for B.C., who had a fever.  Responding emergency medical technicians observed that the home was cluttered, and that six-year-old A.F., four-year-old A.R.C., and three-year-old B.C. were dirty and unkempt.  B.C. appeared sluggish and acted as if he was under the influence of alcohol.  Mother reported she gave

---

[1]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[2]     Father did not appeal.

B.C. Benadryl for his fever. When questioned, B.C. stated, "'I like to drink,'" and Mother explained he liked to get into the recycling and drink remnants from cans. Mother did not smell of alcohol, but a male present in the house did.

A referral was made to Fresno County Department of Social Services (the department), and B.C. was transported to the hospital by ambulance and admitted. He subsequently tested negative for alcohol, but positive for marijuana.

The Fresno Police Department (FPD) conducted a welfare check at the house and cleared it.

At the hospital, a social worker observed Mother appeared to be intoxicated, possibly by methamphetamine, and provided inconsistent stories. Mother told the social worker she had seven children and a history with child protective services (CPS) in Texas due to methamphetamine use. Of the four children not subject to this dependency proceeding, Mother related one was an adult, two were in foster care, and one was adopted.

A department social worker contacted FPD and requested assistance at the hospital for a possible section 300 hold. The responding officer reported Mother told him she did not see B.C. ingest marijuana, but she had taken some marijuana edibles from the freezer and left them out within the children's reach. The officer concluded Mother was not under the influence and a section 300 hold was not warranted at that time.

Additional hospital staff expressed concern based on Mother's changing stories, her confirmation that there was marijuana in the home, and V.C.'s possession of a medical marijuana card.

A department social worker interviewed Mother at the hospital. Mother stated she had left B.C. alone inside while she checked on her other children playing outside. When she returned, B.C. was unbalanced when standing and she thought he might have ingested alcohol as he had done before, although she did not see any open alcohol around. She

3.

gave B.C. water to drink and called for an ambulance after he became more unresponsive and his lips began turning a different color.

Mother admitted she left marijuana edibles belonging to V.C. within reach of the children. She denied marijuana use. She told the social worker she drank occasionally and her drug of choice was methamphetamine, but she had been clean for the past six years. The social worker observed Mother's speech was slurred. Mother stated she was just tired and was willing to take a drug test.

The family had four prior referrals in Fresno County for general neglect. Mother denied there was any domestic violence between her and V.C., and she stated the situation at the house was chaotic and cluttered because an exterminator had been there that morning.

Mother reported she did not have any contact with the three children she lost to CPS in Texas. She stated Father was incarcerated in Texas. Mother did not want to lose her children and said V.C. had agreed to get rid of the marijuana. She stated she disciplined the children through timeouts or took away their tablets or toys, and the children were not in school.

At the house, V.C. showed social workers his medical marijuana card. He reported using edible marijuana for back pain and stated the edibles were usually kept in the freezer where the children could not access them. V.C. denied Mother used marijuana, but said she drank sometimes.

A.F. and A.R.C. appeared healthy and were dressed appropriately, but their clothes were dirty and A.R.C.'s face was dirty. A.F. reported Mother "'whoop[ed]'" them for discipline. V.C. confirmed Mother hit the children on the butt with her hand, but not hard. A.R.C. had what appeared to be bug bites on her legs, and V.C. stated they had bed bugs they were working on getting rid of.

On August 17, 2020, social workers made an unannounced visit to the house around 11:30 a.m. Mother was still at the hospital with B.C. A.F. and A.R.C., who were

4.

playing in the front yard, were filthy and wearing clothing stained with food and dirt. The children called for "'[d]ad,'" and V.C. came outside. He stated he was not the children's biological father, but considered them his children. He smelled of alcohol and reported he drank approximately three "tall cans of beer" per day. He denied he got drunk or that alcohol was a problem for him, and other than drinking and marijuana, he denied he used drugs. When questioned regarding his missing teeth, V.C. said he had them pulled following years of prior drug abuse. He reported he last used heroin in 1979 and he denied methamphetamine use.

Inside the house, social workers observed there was little room to walk in the living room due to clutter and although V.C. reported the kitchen had been emptied to spray for cockroaches and bugs, the items in the living room did not appear to be kitchen items. V.C. also stated they had brought stuff from storage into the house.

Social workers observed dead cockroaches covering the living room and kitchen floors. V.C. stated he was told to leave them on the ground for a few days after extermination. There was ample food in the house, but social workers observed cigarettes, a lighter, what appeared to be marijuana, and a marijuana pipe on the bed in the room V.C. said the children slept in. V.C. stated the items were on the bed because he was getting ready to visit the hospital. He said the marijuana was his and again denied Mother used drugs.

V.C.'s sister came out of her bedroom. She did not smell of alcohol and stated she usually watched the children. The social workers spoke to V.C. and his sister about leaving the children in the yard unsupervised and told them the children needed bathed and clean clothes. V.C. stated they bathed the night before and got dirty playing outside.

At the hospital, a nurse reported Mother slept all morning while B.C. ran around the room unsupervised. When the nurse asked if B.C. had eaten his breakfast, Mother yelled at B.C. to eat. B.C.'s food was out of his reach and the nurse had to direct Mother to feed him. The nurse also had to direct Mother to change B.C.'s poop-filled diaper.

5.

Mother did not appear to be under the influence of anything, but the nurse expressed concern regarding her ability to supervise her children at home given her failure to supervise B.C. at the hospital. Mother also left the room several times and said she was going to the cafeteria.

Mother told social workers that V.C. drank six or seven beers a day, usually beginning around noon, and his sister had stopped drinking four days earlier. Mother reported she moved to Fresno from Texas because her sister lived in Fresno. However, her sister subsequently moved to South Dakota, and V.C. and his sister were Mother's only support. She reported she had no concerns with them caring for the children.

Mother told the social worker the hospital was keeping B.C. another night because he had ringworm on his head, and she said he had a bad case of it the previous month. She also stated she was on two medications for depression and anxiety, but she had not taken her medication while at the hospital with B.C. She was not in therapy and had not seen her assigned psychiatrist at Central Valley Health Team in several months. Mother again agreed to take a drug test, but did not do so.

**Section 300 Petitions**

On August 18, 2020, the department filed a petition on behalf of the children alleging they came within the juvenile court's jurisdiction under section 300, subdivision (b)(1), as to Mother and sought a protective custody warrant. The petition identified A.C. as the children's alleged father, whereabouts unknown.

The juvenile court granted the department's request, and the children were taken into protective custody on August 18, 2020.

On August 20, 2020, the department filed an amended petition correcting A.R.C.'s name, reflecting A.C. was A.R.C.'s and B.C.'s presumed father, and reflecting the children were taken into protective custody and placed in foster care.

6.

**Detention Hearing**

On August 21, 2020, the juvenile court held a detention hearing. The court found a prima facie showing that the children were persons described by section 300 and ordered them detained in foster care. The court directed the department to provide Mother with supervised visitation no less than once a week, a mental health assessment and treatment recommendation for the children, and random drug testing for Mother.

**Jurisdiction and Disposition Hearings**

The department's combined jurisdiction and disposition report, which included two addenda, recommended that the juvenile court sustain the petition allegations, and adjudge the children dependents of the court and to remain out of Mother's care.

The report summarized Mother's CPS history in Texas, where Mother reportedly lost custody of three children. In 2012, CPS in Texas received a referral concerning Mother's 11-year-old daughter, F.R., and three-year-old son, C.B. Mother reportedly called her daughter names, and Mother and a male living in the house hit both children with wooden and metal spoons, which led to bruising and permanent scars on F.R. and bruising on C.B. There was also suspected drug use in the household. The children were removed, and F.R. was subsequently adopted by a maternal aunt in South Dakota.

In 2014, CPS in Texas received another referral when Mother tested positive for cocaine, amphetamine, and methamphetamine after giving birth to her daughter, I.C. I.C. was subsequently removed from Mother's care after Mother reported she used methamphetamine the day before giving birth because she was in pain from contractions. I.C. was placed with adoptive parents in Texas after a failed placement with a relative and Mother's continued methamphetamine use.

Based on Mother's past CPS history in Texas, the department recommended Mother be denied reunification services under section 361.5, subdivision (b)(11) and (13). The department also recommended Father be denied reunification services as to

7.

A.R.C. and B.C. under section 361.2, subdivision (a), and as to A.F. under section 361.5, subdivision (a).

On November 17, 2020, the juvenile court held the jurisdiction hearing, and found the petition allegations true and the children as described under section 300. The disposition hearing was continued.

On January 19, 2021, the juvenile court granted Father's request and by interlineation, amended the petition to elevate Father to A.F.'s presumed father.

On February 5, 2021, the juvenile court held a contested disposition hearing. The court found the children did not come within the provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.), adjudged the children dependents of the court, removed the children from Mother's and Father's custody, and denied Mother and Father reunification services. The court directed the department to provide reasonable supervised visits to Mother and Father at least one time per month. The court set a section 366.26 hearing for June 3, 2021.

**Section 366.26 Reports**

As summarized in the original report prepared for the section 366.26 hearing, the children's first placement was in a home unwilling to provide a permanent plan. Their second placement with a prospective adoptive family ended after the family reported some aggressive behaviors the family felt unequipped to handle. Their third placement, with another prospective adoptive family, ended due to a change in the family's dynamics; the family did not report any concerns with the children. On April 29, 2021, the children entered their fourth placement with a prospective adoptive family who had briefly provided respite care when the children were removed from their second placement.

The department recommended the section 366.26 hearing be continued 60 days to assess the most appropriate plan for the children given their recent fourth placement,

8.

where they were doing well. The department subsequently filed two addenda recommending termination of Mother's and Father's parental rights.

The department reported Mother had a Zoom visit with the children in September 2020. A.R.C. told Mother she did not wear diapers anymore and Mother praised her. A.R.C. began to cry during the visit, asked to come home, and said she missed Mother.

Mother failed to show for eight consecutive random drug tests between August 2020 and November 2020. In November and December 2020, Mother tested positive for amphetamine six times, cocaine once, and alcohol seven times.

Mother missed her scheduled visit in January 2021, and she was thereafter denied reunification services at the disposition hearing.

Mother began in-person visits with the children in April 2021. Mother reportedly had good engagement with the children and provided positive praise. Mother complained that the children called her by her first name, but a social worker reported observing Mother tell her children to call her by her first name.

Mother cancelled a visit scheduled for July 6, 2021. Several days later, the department was contacted by someone who reported Mother was using methamphetamine daily, knew how to avoid positive drug tests, and was homeless. The children subsequently had a visit with Mother on July 13, 2021, but she failed to show up for a visit scheduled on July 16, 2021.

In October 2021, Mother complained the children appeared dirty during her visit with them and she was concerned about them. Mother expressed her desire to move to South Dakota with the children to live with her sister. She reported V.C. was stalking her and there had been an incident of domestic violence. Mother was staying at the Marjaree Mason Center and reported V.C. found her at two previous addresses where she was staying with friends and then at the Poverello House.

With respect to Father, he contacted the department in December 2020 and reported he was incarcerated in Texas. He contacted the department again in June 2021

after his release. He inquired about gaining custody of his children, but subsequently stated he did not "'want to mess anything up for them,'" and "'everything is going as how it should be.'" Father had one supervised visit with the children in July 2021 via Zoom, which he ended early. The prospective adoptive parents reported the children were confused by the visit and it appeared to undermine their security; A.R.C. and B.C. did not remember Father and A.F. appeared to have very limited memories of Father. Father's second scheduled visit in August 2021 was cancelled after he failed to join within the 15-minute courtesy window and his third scheduled visit in September 2021 was cancelled after he failed to appear.

As summarized in the report, A.F. had no significant developmental delays, but initially struggled with learning because he had not been enrolled in school under Mother's care. He had difficulty with remote learning the previous school year, but in August 2021, he began attending first grade in person and was doing well. A.F. initially shut down, and he displayed anger and aggression at times. He worked with a clinician on anxiety, sadness and depression, and his clinician attributed the aggression he displayed in the second placement to parenting techniques in the home. A.F. was reportedly happy and doing well in his fourth placement.

A.R.C. was in good health overall, but was developmentally delayed in speech and scored low for fine motor and personal-social skills. She was also small for her age and was not gaining weight. These issues were being addressed by the prospective adoptive parents in her fourth placement. A.R.C. was seeing a clinician for symptoms of anxiety and depression, but she was "emotionally and mentally happy" in her fourth placement. Her start date for kindergarten was pending.

B.C. did not have any developmental delays, but his communication skills score was low. He was seeing a clinician for symptoms of anxiety, fidgetiness, and agitation. His prospective adoptive parents reported he was startled by loud noises, but was doing well. He started preschool in September 2021.

10.

The children were observed "to have a significant relationship with each other," with A.F. in a caretaking role for A,R,C, and B.C. The children wished to remain together, and their current placement was in a home with prospective adoptive parents who desired to adopt all three children. The prospective adoptive parents reported that the children did well during a long period without visitation with Mother, but regressed some after visiting with Mother in July 2021. They reported that A.F. was shutting down when upset; A.R.C. was behaving aggressively and reacting emotionally like she did at the beginning of the placement; and B.C. was having nightmares, was unable to sleep at night, and was aggressive during the day. After visiting Mother, B.C. related that Mother and V.C. would tell the children that if they got up in the middle of the night, the boogeyman would get them; and A.R.C. recalled Mother choking her.

**Section 366.26 Hearing**

On October 26, 2021, the juvenile court held a contested section 366.26 hearing. Mother testified that every visit was "really good" and she had a "bond" with the children. She testified A.F. appeared to want to tell her something, but he would shut down, A.R.C. had lost weight, but was "full of life," and the children would ask her if she was still fighting for them and tell her they wanted to go with her. Mother described going on walks and to the park, the store, and the zoo, and having movie nights prior to the children's removal. She said they were excited to see her during visits, but it was difficult to visit due to the limitations at the visitation center. She watched movies with them, asked them what they were learning at school, asked them how they were feeling, and worked on activities during visits.

Mother described her bond with the children as "[v]ery strong," and stated the children let her know they want her to be a part of their lives. She testified she completed courses through WestCare, she was not in a relationship with V.C., and she was working with the Marjaree Mason Center. She stated her sisters and the children's cousins in South Dakota would provide them with family support and a place to live. She requested

the juvenile court not terminate her parental rights and said the children needed her as much as she needed them.

Social worker Mayli Vang testified that the permanent plan of adoption by the current care providers, who provided stability, was in the children's best interest. The children were all enrolled in school, they were happy, and they were doing extremely well.

Vang observed Mother's visit on July 13, 2021. Vang testified she did not hear the children tell Mother they wanted to live with her. Vang stated that the children looked up to Mother and recognized her as their mother and, and that "some would say" the children and Mother "have a good, positive relationship," but it remained her recommendation to terminate Mother's parental rights.

The department submitted on its report and recommendation, and argued there was no evidence of a beneficial relationship with Mother that outweighed the benefit of adoption. As to Father, counsel argued there was no evidence of a beneficial relationship.

Mother's counsel argued the beneficial parent-child relationship exception applied, precluding termination of her rights.

Father did not appear for the hearing, but his counsel objected to the termination of his rights.

The juvenile court found adoption was the appropriate permanent plan for the children, found the beneficial parent-child relationship exception argued by Mother did not apply, and terminated Mother's and Father's parental rights.

Mother now challenges the finding that the beneficial parent-child relationship exception did not apply.

DISCUSSION

I.    **Legal Principles**

    A.    **Beneficial Parent-child Relationship Exception**

At a section 366.26 hearing, the juvenile court must determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." *(Caden C., supra*, 11 Cal.5th at p. 625.) "[T]he goal at the section 366.26 hearing is 'specifically … to select and implement a permanent plan for the child.'" (*Id.* at p. 630.) "[T]he question before the court is decidedly not whether the parent may resume custody of the child." (*Ibid.*) Instead, "when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*)

However, "[e]ven when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute." (*Caden C., supra*, 11 Cal.5th at p. 629.) "[W]hen a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.'" (*Id.* at p. 631.)

At issue here is the beneficial parent-child relationship exception to termination of parental rights. In *Caden C.*, which was decided five months before the section 366.26 hearing in this case, the California Supreme Court clarified the exception and the applicable standard of review. (*Caden C., supra*, 11 Cal.5th at p. 629.) The three elements to the exception, which the parent must establish by a preponderance of the evidence, are "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at p. 631.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new

13.

adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.] Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child." (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

"In each case, … the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the

14.

sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C., supra*, 11 Cal.5th at pp. 633–634.)

### 2. Standard of Review

We review the juvenile court's findings on the first two elements for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 639.) As to the third element, a hybrid standard applies. "[T]he court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Id.* at p. 640.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.] Uncontradicted testimony rejected by the trial court '"cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved."'" (*Caden C., supra*, 11 Cal.5th at p. 640.)

"Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when '"'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"' [Citation.] But '"'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*Caden C., supra*, 11 Cal.5th at p. 641.)

## II.    No Error

As a general matter, "'"[w]e must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed. [Citation.]" [Citations.]'" (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1160 (*A.L.*).) Further, "'[i]n the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law."'" (*People v. Jones* (2017) 3 Cal.5th 583, 616, quoting *People v. Thomas* (2011) 52 Cal.4th 336, 361; accord, *People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) Mother claims that because the juvenile court failed to mention *Caden C.*, these general presumptions do not apply. However, *Caden C.* was issued five months before the section 366.26 hearing in this case and nothing in the record affirmatively demonstrates the juvenile court misunderstood or misapplied the law. Accordingly, we reject this contention.

16.

Regarding the first and second elements, the juvenile court stated, "[T]here is no doubt that mother has maintained visitation with the children." The court also noted the social worker's testimony that the children and Mother had a positive relationship and they recognized Mother as someone they could look up to, and the court agreed with the department's characterization of the relationship as "like a relative or maybe a friendly visitor." These findings in Mother's favor are supported by substantial evidence.

It is the third element that is in dispute. Mother bears the burden of demonstrating that terminating the children's substantial, positive attachment to her "would be detrimental to [them] even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

In *Caden C.*, the appellate court concluded that the juvenile court erred when it found the mother established the beneficial parent-child relationship exception and it reversed. The appellate court opined, in relevant part, "that [the] mother '"had not maintain[ed] her sobriety and address[ed] her mental health issues,"'" and "'[n]o reasonable court would apply the beneficial relationship exception on this record of [the] mother's disengagement from treatment and case plan, inability or unwillingness to remain sober, and deficient insight regarding her parenting.'" (*Caden C., supra*, 11 Cal.5th at pp. 641–642.) The California Supreme Court held this was error, stating, "Even where a parent continues to struggle with addiction—and even if she believes that her addiction doesn't make her an unfit parent—a reasonable court could conclude that termination of parental rights would, on balance, be detrimental to the child." (*Id.* at p. 642.)

While they may not be treated as a categorial bar, "issues such as those that led to dependency [nonetheless] often prove relevant to the application of the exception." (*Caden C., supra*, 11 Cal.5th at p. 637.) "A parent's struggles may be most directly relevant … to the '"positive" or "negative" effect of interaction between parent and child' [citation] and then somewhat more indirectly to the harm of removing such interactions

17.

from the child's life.  [Citation.]  But how and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions not always answered just by determining how beneficial the child's relationship with the parent is.  Though there is no reason for a court to consider 'a second time' the same struggles in the same way, a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental."  (*Id.* at p. 639.)

The juvenile court did not treat Mother's substance abuse issues and lack of stability as "a categorial bar to applying the exception" (*Caden C., supra*, 11 Cal.5th at p. 637), and, therefore, this case does not involve the error at issue in *Caden C.*  Nor did the juvenile court improperly base its decision on a comparison of "[the mother's] attributes as custodial caregiver relative to those of any potential adoptive parent(s)."  (*Id.* at p. 634.)  Although Mother argues the juvenile court discounted her testimony and improperly judged her vocabulary and lack of eloquence, the record does not support this assertion.  To the contrary, the court expressly found both witnesses—Mother and Vang—"generally credible."

The juvenile court was required to evaluate the strength and quality of the children's relationship with Mother in determining whether termination would be detrimental.  (*Caden C., supra*, 11 Cal.5th at p. 634; *A.L., supra*, 73 Cal.App.5th at p. 1157.)  "Interaction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575), and the evidence showed a general bond between Mother and her children that was positive, which the juvenile court recognized.  However, Mother did not present any evidence that spoke to the specific strength or quality of the bond, and the juvenile court found the relationship akin to that of friendly visitors.

The children, who were three, four, and six years old when they were removed from the home, had been out of Mother's care for 14 months.  They had been in the care

18.

of the prospective adoptive family just days shy of six months and the evidence showed the children were thriving; they were reportedly happy, secure and well adjusted, although there was some regression after their visit with Mother in July 2021. Mother did not offer any evidence or point to any evidence in the record showing it would be detrimental to the children if her relationship with them was terminated and, notably, she cites no authority supporting reversal of a juvenile court's determination in circumstances analogous to these. Rather, Mother relies on the assertion that the juvenile court focused on improper factors and did not cite *Caden C.* We have already rejected Mother's argument regarding absence of citation to *Caden C.* and the record does not support a claim that the juvenile court based its decision on grounds precluded under *Caden C.*

We do not doubt that Mother loves her children or that the children enjoyed positive visits with her. However, Mother bears the burden of proving the beneficial parent-child relationship exception applies and we conclude she has not demonstrated error. To the contrary, substantial evidence in the record supports the juvenile court's express and implied findings,[3] and the court did not abuse its discretion in determining that the exception did not apply. Therefore, we affirm the order terminating Mother's parental rights.

## DISPOSITION

The order terminating Mother's parental rights under section 366.26 is affirmed.

---

[3] Although it would benefit the record for purposes of review if lower courts would articulate their findings at each step, it is not a requirement and Mother does not argue otherwise. (*A.L., supra*, 73 Cal.App.5th at p. 1156; accord, *In re G.P.* (2014) 227 Cal.App.4th 1180, 1196 [detriment finding may be implied].)